## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATHANIEL SILVA and PHIL ROTHKUGEL, on behalf of themselves and all others similarly situated,<br><br>　　*Plaintiffs*,<br><br>　　v.<br><br>SCHMIDT BAKING DISTRIBUTION, LLC and SCHMIDT BAKING COMPANY, INC.,<br><br>　　*Defendants*. | No. 3:23-cv-01695-MPS |

### RULING ON MOTION TO COMPEL ARBITRATION

### I.    INTRODUCTION

Plaintiffs Nathaniel Silva and Phil Rothkugel brought this putative class action against Defendants Schmidt Baking Company, Inc. ("SBC") and Schmidt Baking Distribution, LLC ("SBD") alleging that they were Defendants' employees and that Defendants misclassified them as independent contractors, made unlawful deductions from their wages, and failed to pay them for overtime work in violation of Connecticut wage laws.  Defendants filed a motion to compel arbitration, arguing that arbitration agreements contained within the relevant contracts govern the disputes at issue in this case.  For the reasons explained below, I grant Defendants' motion to compel arbitration.

### II.    FACTS

#### A.    Factual Background

The following facts are drawn from the complaint, along with the exhibits attached to the parties' briefs.

1.      **Parties**

SBC "develops, manufactures, and markets bread and bread-like products to retailers and foodservice outlets."  ECF No. 11 at 43.  To coordinate the distribution of SBC's products, SBD, a subsidiary of SBC, enters into Distribution Agreements with independent operators, "which give those companies exclusive rights to distribute and sell various Schmidt products to outlets within their designated territories."  *Id.*; *see also* ECF No. 3 (noting that SBD's sole member is SBC).

Nathaniel Silva worked for SBC as a delivery driver from approximately February 2020 to June 2020.  ECF No. 24-1 at ¶ 6.  In June 2020, SBC informed Silva that to continue to work for SBC, he would need to form a corporate entity and sign a Distribution Agreement with SBD. *Id.* at ¶¶ 7–10.  Silva formed Silva's Baked Goods, Inc. ("Silva's Baked Goods"), *id.* at ¶ 9, and on June 24, 2020, Silva's Baked Goods entered into a Distribution Agreement with SBD for the right to distribute SBC bread products to a certain sales area in Connecticut, ECF No. 11 at 46. On October 28, 2020, Silva's Baked Goods entered into a second Distribution Agreement with SBD for the right to distribute to another area within Connecticut.  *Id.* at 80.  Silva signed each of these agreements in his role as President of Silva's Baked Goods.  *See id.* at 75, 109.  Silva also signed as "controlling shareholder of Silva's Baked Goods," agreeing to "guarantee[] the full and complete performance by Silva's Baked Goods" of its obligations under the Distribution Agreements.  *Id.*

Phil Rothkugel worked for SBC as a delivery driver from approximately October 2020 to December 2020.  ECF No. 24-2 at ¶ 5.  In December 2020, SBC informed Rothkugel that to continue to work for SBC, he would need to form a corporate entity and sign a Distribution Agreement with SBD.  *Id.* at ¶¶ 6–8.  Rothkugel formed Trout Slayers Baked Breads, Inc.

("Trout Slayers"), and on December 16, 2020, Trout Slayers entered into a Distribution

Agreement with SBD for the right to distribute Schmidt brand bread products to a sales area in

Connecticut.  ECF No. 11 at 115.  Rothkugel signed this agreement in his role as President of

Trout Slayers.  *Id.* at 144.  Rothkugel also signed as "controlling shareholder of Trout Slayers,"

agreeing to "guarantee[] the full and complete performance by Trout Slayers" of its obligations

under the Distribution Agreements.  *Id.*

### 2.    Distribution Agreements

The relevant provisions of the three Distribution Agreements at issue here are

indistinguishable.  The agreements provide Silva's Baked Goods and Trout Slayers with "the

sole right to sell and distribute [SBC] Products to Outlets in the Sales Area by Direct Store

Delivery."  *Id.* at 48, 82, 117.

Article 11 of the Distribution Agreements sets forth the dispute resolution procedures to

be followed in the event of "[a]ny dispute . . . arising out of the relationship[s] created by [the]

Agreement[s]."  *Id.* at 68, 102, 137.  Section 11.2 of the agreements provides that, "[i]n the event

of any dispute[,] either party may initiate a mediation procedure."  *Id.*  Section 11.3 sets forth the

arbitration provision of the Distribution Agreements and provides in pertinent part:

> If the parties are unable to resolve the dispute through mediation, either party may
> avail itself of the right to seek relief from an arbitrator, by filing a complaint within
> ten (10) days following the conclusion of the mediation process, which period shall
> constitute an agreed time limitation, and such complaint shall be limited to the
> cause(s) of action within the scope of the mediation conducted in accordance or
> Section 11.2 above.  Any dispute between the parties subject to this Article shall be
> decided by neutral, binding arbitration conducted in accordance with the Judicial
> Arbitration and Mediation Services, Inc. ("JAMS").

*Id.* at 69, 103, 138.

In addition, Section 11.7 of the agreements, which is entitled "Individual Action,"

provides as follows:

The parties agree that any proceeding in any forum to resolve any dispute, including mediation, arbitration, litigation, and/or government action involving DISTRIBUTOR [defined in the Distribution Agreements to be Silva's Baked Goods or Trout Slayers], shall be conducted on an individual basis only, and not on a class-wide basis or as a representative action, collective action, or a collective governmental action. The parties further agree that only [SBD] (and its affiliates and their respective owners, officers, directors, agents and employees, as applicable) and DISTRIBUTOR (and its affiliates and their respective owners, officers, and directors, as applicable) may be the parties to any proceeding described in this Section, and that no such proceeding shall be consolidated, combined, or joined with any other proceeding involving [SBD] and/or any other person without the written consent of all parties.

*Id.* at 71, 105, 140.

### B.    Procedural Background

Plaintiffs served their class action complaint, which was filed in Connecticut superior court, on Defendants on November 30, 2023. ECF No. 11 at 167. On December 5, Defendants' counsel contacted Plaintiffs' counsel to determine whether Plaintiffs were interested in mediating their disputes. ECF No. 11 at 167–68. Plaintiffs declined to participate in mediation. *Id.* at 168. Then Defendants' counsel contacted Plaintiffs' counsel to determine whether Plaintiffs would voluntarily dismiss the complaint and resolve their claims in individual JAMS arbitrations. *Id.* On December 11, Plaintiffs' counsel indicated that Plaintiffs intended to pursue their claims through litigation, that they believed their disputes were not covered by an arbitration agreement, and that the arbitration provisions in their Distribution Agreements were unenforceable. *Id.* On December 15, Defendants filed with JAMS demands for individual arbitration of Plaintiffs' claims. *Id.*

Defendants removed Plaintiffs' case from the Connecticut superior court to this Court on December 29. ECF No. 1. On January 5, 2024, Defendants filed the pending motion to compel arbitration, ECF No. 10; ECF No. 11, which is now fully briefed, *see* ECF No. 24; ECF No. 28.

4

### III.    LEGAL STANDARD

"In deciding motions to stay or compel arbitration, courts apply a standard similar to that applicable for a motion for summary judgment." *Boroditskiy v. Eur. Specialties LLC*, 314 F. Supp. 3d 487, 492 (S.D.N.Y. 2018) (internal quotations marks omitted).  That standard requires this Court to "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks omitted).

### IV.    DISCUSSION

Defendants argue that Plaintiffs, "through corporate entities they created and owned," entered into the Distribution Agreements, and that the arbitration provisions of the Distribution Agreements are binding on Plaintiffs.  ECF No. 11 at 2.  Defendants further argue that the Distribution Agreements delegate to arbitrators all disputes concerning the scope of the agreements' arbitration provisions, including disputes over arbitrability.  Plaintiffs counter that: (1) Plaintiffs are not parties to the Distribution Agreements, and thus the agreements are not binding on them; (2) even if the Distribution Agreements are binding on them, Plaintiffs are exempt from arbitrating their claims under § 1 of the Federal Arbitration Act ("FAA"); (3) the Distribution Agreements do not validly delegate questions of arbitrability to an arbitrator; (4) in the absence of an enforceable delegation clause, Plaintiffs' wage and hour claims are outside the scope of the arbitration agreements; (5) in any event, the arbitration provisions of the Distribution Agreements as a whole are unconscionable; and (6) SBC is not a party to the Distribution Agreements and thus cannot invoke the agreements' arbitration provisions.

### A.  Exemption Under § 1 of the FAA

Plaintiffs argue that they are exempt from arbitration under § 1 of the FAA.[1]  Section 1 of

the FAA exempts from arbitration "contracts of employment of seamen, railroad employees, or

any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  In *Circuit*

*City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), the Supreme Court explained the historical

rationale for this exemption:

> By the time the FAA was passed, Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers, *see* Shipping Commissioners Act of 1872, 17 Stat. 262.  When the FAA was adopted, moreover, grievance procedures existed for railroad employees under federal law, *see* Transportation Act of 1920, §§ 300–316, 41 Stat. 456, and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent, *see* Railway Labor Act of 1926, 44 Stat. 577, 46 U.S.C. § 651 (repealed).  It is reasonable to assume that Congress excluded "seamen" and "railroad employees" from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers.
>
> As for the residual exclusion of "any other class of workers engaged in foreign or interstate commerce," Congress' demonstrated concern with transportation workers and their necessary role in the free flow of goods explains the linkage to the two specific, enumerated types of workers identified in the preceding portion of the sentence.  It would be rational for Congress to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation.  *See Pryner v. Tractor Supply Co.,* 109 F.3d, at 358 (Posner, C. J.).  Indeed, such legislation was soon to follow, with the amendment of the Railway Labor Act in 1936 to include air carriers and their employees, *see* 49 Stat. 1189, 45 U.S.C. §§ 181–188.

*Id.* at 121.  Given this historical context—as well as the fact that the "engaged in . . . commerce"

language of § 1 was located in a residual clause and the FAA's purpose of "overcom[ing]

---

[1] As discussed further below, the parties dispute whether the Distribution Agreements validly delegated arbitrability issues to an arbitrator.  *See* Section IV.C *infra*.  Nevertheless, "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration" and "a court may use §§ 3 and 4 [of the FAA] to enforce a delegation clause . . . only if the contract in which the clause appears doesn't trigger § 1's 'contracts of employment' exception."  *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111–12 (2019).  As such, I begin by considering the applicability of § 1.

judicial hostility to arbitration agreements"—the Supreme Court explained that "the § 1 exclusion provision [should] be afforded a narrow construction." *Id.* at 118.

Plaintiffs assert that they are covered under § 1's exemption, arguing that the Supreme Court's holding in *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019), "squarely addressed" the circumstances here. ECF No. 24 at 20. In *New Prime*, the Supreme Court determined that "Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of **work** by **workers**." *Id.* at 116 (emphasis in original). Thus, the Court held that the phrase "contracts of employment" includes not just "contracts that reflect an employer-employee relationship," but also "contracts that require an independent contractor to perform work." *Id.* at 113.

But, contrary to Plaintiffs' assertions, *New Prime* did not address the issue raised by the Distribution Agreements, *i.e.*, whether a contract between two business entities could constitute a "contract[] of employment" within the meaning of § 1. *See, e.g.*, *Bissonette v. Lepage Bakeries Park St., LLC*, 460 F. Supp. 3d 191, 194 n.2 (D. Conn. 2020), *vacated and remanded on other grounds*, No. 23-51, 2024 WL 1588708 (U.S. Apr. 12, 2024) ("The Supreme Court has never had occasion to determine whether the FAA Section 1 exemption would apply to an alleged 'transportation worker' that is in fact a legal entity such as a corporation and not a person. . . . . [B]ecause the parties [in *New Prime*] agreed that [the independent contractor or employee] was otherwise 'a worker engaged in interstate commerce' for purposes of the FAA, the issue was apparently not before the Supreme Court."); *Gray v. Schmidt Baking Co., Inc.*, No. 22-CV-00463-LKG, 2023 WL 9285466, at *2 (D. Md. Oct. 16, 2023) ("[T]he Supreme Court has not addressed whether Section 1 of the FAA applies when the parties to an agreement are both business entities, such as a corporation or limited liability company . . . ."); *Fli-Lo Falcon, LLC*

*v. Amazon.com Inc.*, No. C22-441, 2022 WL 4451273, at *5 (W.D. Wash. Sept. 8, 2022) ("The Supreme Court [in *New Prime*] was not tasked with, and has not yet addressed, the issue instead posed in this matter—whether an LLC or a corporate entity itself can qualify as a 'class of worker' engaged in foreign or interstate commerce."), *report and recommendation adopted*, No. C22-441, 2022 WL 4448654 (W.D. Wash. Sept. 23, 2022), *aff'd*, 97 F.4th 1190 (9th Cir. 2024); *Carter O'Neal Logistics, Inc. v. FedEx Ground Package Sys., Inc.*, No. 2:17-cv-02799, 2020 WL 13111153, at *3 (W.D. Tenn. Mar. 19, 2020) ("*New Prime* . . . does not stand for the proposition that the FAA exception for transportation workers applies to corporate entities.").

While the Supreme Court has not decided whether § 1 applies to contracts between two business entities, several lower courts have reached this question and have uniformly answered it in the negative.  *See, e.g.*, *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1195–96 (9th Cir. 2024) ("The text of the transportation worker exemption makes clear—and we hold—that the [FAA's] residual clause does not extend to business entities like plaintiffs. . . .  While a natural person such as an independent contractor may be a transportation worker, a nonnatural person such as a business entity that employs or contracts with transportation workers, is not and cannot be a transportation worker.  Nor is such a nonnatural person 'similar in nature' to a transportation worker. . . .  We also relatedly hold that 'contracts of employment' in the transportation worker exemption do not extend to commercial contracts like the DSP Agreements."); *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596 (4th Cir. 2023) ("[T]he Agreement at hand simply is not a 'contract of employment'—it does not promise work and compensation to an individual employee, and it contains none of the hallmarks of a traditional employment contract, such as provisions regarding salary, benefits, and leave time.  The Agreement provides instead for certain business services to be provided by one business to

another . . . ."); *Gray*, 2023 WL 9285466, at *3–4 (holding that "the parties to the Distribution Agreements are business entities who have entered into a commercial contract for the distribution of baked goods" and as such "the Distribution Agreement is not an 'employment contract' and Plaintiffs are, therefore, precluded from invoking the exemption under Section 1 of the FAA"); *ShaZor Logistics v. Amazon.com, LLC*, 2022 WL 4277190, at *2 (E.D. Mich. Sept. 15, 2022) ("Section 1 is inapplicable to contracts between businesses[] because businesses do not sign employment contracts with one another . . . ."); *R&C Oilfield Servs., LLC v. Am. Wind Transp. Grp.*, LLC, 447 F. Supp. 3d 339, 347 (W.D. Pa. 2020) (holding that an agreement between two business entities "cannot reasonably be construed as a contract of employment governing 'work by workers'"); *D.V.C. Trucking, Inc. v. RMX Glob. Logistics, Inc.*, No. CIV.A. 05-CV-00705, 2005 WL 2044848, at *3 (D. Colo. Aug. 24, 2005) (declining to apply § 1 exemption because the corporate plaintiff was "not an employed 'transportation worker' engaged in interstate commerce, but rather is a business corporation.").

I agree with the holding of these cases.  The Distribution Agreements contain none of the characteristic elements of employment contracts, such as terms regarding salaries or benefits. Instead, they read like what they are—agreements between businesses.  They provide that Silva's Baked Goods and Trout Slayers will buy baked goods from SBD, with title passing at the time of delivery; will have "the right to operate the business as [they] choose[]"; "shall bear all risks and costs of  operating [their] business[es]"; and will be responsible for hiring and firing their own employees.  ECF No. 11 at 49–53, 83–87, 118–22.  In addition, the Distribution Agreements leave Silva's Baked Goods and Trout Slayers free both to distribute merchandise for other firms, unless those firms compete with SBD or joint carriage of the products would contaminate the SBD baked products, *id.* at 55–56, 89–90, 124–25, and to sell their distribution rights, provided

SBD approves (which approval may not be unreasonably withheld), *id.* at 59, 93, 128. These are not terms typically seen in contracts between a business and its workers; they are, instead, terms that suggest a supplier-distributor relationship between two companies. Further, corporations and limited liability companies ("LLCs") are not "workers" under the statute. Because the Distribution Agreements here are between two business entities, they are not contracts of employment and the § 1 exception does not apply.[2]

For these reasons, I conclude that Plaintiffs are not exempt from arbitration under § 1 of the FAA.

**B.     Application of the Arbitration Agreements to Plaintiffs and SBC**

Plaintiffs argue that they are not parties to the Distribution Agreements and so are not bound by the agreements' arbitration provisions. Similarly, they argue that SBC is not a party to the agreements and thus cannot enforce the arbitration provisions.

"A motion to compel arbitration requires a court to consider at the outset whether the parties have actually agreed to arbitrate." *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 66 (D. Conn. 2020). "[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract," which requires courts to decide whether the parties have agreed to arbitrate, a question "governed by state-law principles of contract formation." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475

---

[2] Plaintiffs filed their brief before the Supreme Court's decision in *Bissonette v. Lepage Bakeries Park St., LLC*, and the brief anticipates that the *Bissonette* decision will affect the applicability of the § 1 exception to Plaintiffs. ECF No. 24 at 15. But the Supreme Court has now issued its decision, and it does not help Plaintiffs here. As the Court explained, "[t]he only question before us is whether a transportation worker must work for a company in the transportation industry to be exempt under §1 of the FAA." 2024 WL 1588708, at *4. Thus, the Court did not address the question at issue here—*i.e.*, whether a contract between two businesses can constitute a "contract[] of employment" under § 1 of the FAA. *See id.* at *6 ("We express no opinion on any alternative grounds in favor of arbitration raised below . . . ."); *see also Bissonette*, 460 F. Supp. 3d at 194 n.2 (*Bissonette* District Court explaining that "[n]either the Plaintiffs nor the Defendants draw a distinction between the Plaintiffs and their respective companies and neither has argued that the distinction has any bearing on the issues to be decided," and declining to "take up the issue").

U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (internal quotation marks omitted)).  And while no one disputes here that the Distribution Agreements are contracts and that they include arbitration clauses, the question whether the Plaintiffs and SBC are parties to or are otherwise bound by those Agreements is included within the broader issue of whether the parties agreed to arbitrate their disputes.  *See Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 677 (2d Cir. 1972) ("[I]t is well established that whether a person is a party to the arbitration agreement also is included within the statutory issue of the making of the arbitration agreement." (internal quotation marks omitted)).

Maryland law governs that question here.  "A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."  *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001).  "Under Connecticut choice-of-law rules, Connecticut courts will give effect to the parties' contractual choice-of-law provisions."  *New Falls Corporation v. Lerner*, 579 F. Supp. 2d 282, 286 (D. Conn. 2008).  Here, the Distribution Agreements contain a choice-of-law provision indicating that "[t]he validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the state of Maryland . . . ."  ECF No. 11 at 74, 108, 143.  So I must apply Maryland law to determine whether the parties to this suit have agreed to arbitrate their disputes.

Defendants argue that the threshold question of whether the parties have agreed to arbitrate has been delegated to the arbitrator.  *See* ECF No. 11 at 23–24.  But Maryland courts have held otherwise.  "Although [Maryland] law looks with favor upon arbitration as a method of dispute resolution, it does not look with favor upon sending parties to arbitration when there is

11

no agreement to arbitrate." *Town of Chesapeake Beach v. Pessoa*, 330 Md. 744, 757 (1993); *see also Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 378 Md. 139, 147 (2003) ("[A] party cannot be required to submit any dispute to arbitration that it has not agreed to submit." (internal quotation marks omitted)).  The issue of whether nonsignatories are bound by an arbitration agreement is included within the broader issue of contract formation, and so it is an issue for courts to address.  *See Bonner v. Kimmico, Inc.*, No. 23-CV-2062, 2023 WL 8807029, at *3 n.5 (D. Md. Dec. 20, 2023) (resolving "the issue of whether nonsignatories . . . may be bound by the arbitration agreements" before delegating gateway questions of arbitrability to an arbitrator).  So the issue of whether Plaintiffs are bound by the Distribution Agreements' arbitration provisions is for me, not an arbitrator, to decide.

Here, the language of the Distribution Agreements evinces an intent to bind both Plaintiffs and SBC to arbitrate their disputes.  Section 11.7 of the Distribution Agreements, entitled "Individual Action," provides, in pertinent part, that "[t]he parties . . . agree that only [SBD] (and its affiliates and their respective owners, officers, directors, agents and employees, as applicable) and DISTRIBUTOR (and its affiliates and their respective owners, officers, and directors, as applicable) may be the parties to any proceeding described in this Section."  ECF No. 11. at 71, 105 140.  The types of proceedings described in Section 11.7 include "mediation, arbitration, litigation, and/or government action."  *Id.*  Silva and Rothkugel are the presidents and "controlling shareholder[s]" of their respective companies, ECF No. 11 at 75, 109, 144, making them both owners and officers of these companies.  And SBC, as the parent company of SBD, *see* ECF No. 1 at 28; ECF No. 3 at 1 (explaining that SBC is SBD's "sole member"), qualifies as an owner or affiliate of SBD.

Plaintiffs argue that Section 11.7, which they call a "class action waiver," does not provide a basis to compel them to arbitrate because it uses permissive language to describe the persons who "may be" parties to any proceeding.  ECF No. 24 at 16 ("The language does not state that the owners must bring claims in arbitration . . . .").  Read as a whole, however, Section 11.7 supports Defendants' argument that a party to the agreement may compel the non-parties specifically listed in that section (*i.e.*, affiliates, owners, officers, and directors) to arbitrate. While the word "may" is by itself permissive, it is framed by the word "only," suggesting that the sentence as a whole is best read as a prohibition against joining any persons not a party and not listed in the parentheticals that follow the references to the parties to the Distribution Agreement.  *See* ECF No. 11 at 71, 105, 140 ("*only* SCHMIDT (and its affiliates and their respective owners, officers, directors, agents and employees . . .) and DISTRIBUTOR (and its affiliates and their respective owners, officers and directors . . .) *may* be the parties . . . ." (emphasis added)).  This language makes clear that (1) the parties to the Distribution Agreements and (2) the persons listed in the parentheticals (whom I will call "party-related persons")—and only these two categories of persons—"may be the parties" to the proceeding.  A party to a legal proceeding can be either a plaintiff or a defendant, in the case of litigation, or a claimant or a respondent, in the case of arbitration.  *See Black's Law Dictionary* (defining "party" as, among other things, "[o]ne by or against whom a lawsuit is brought (a party to the lawsuit)") (9th ed. 2009).  This suggests that, under Section 11.7, the parties and party-related persons may be either type of "party" to the proceeding, *i.e.*, in the case of an arbitration, claimants or respondents.  As noted, Section 11.7 applies not only to arbitration but to "mediation . . . litigation, and/or government action," and in litigation at least, joinder rules ordinarily provide both that persons may participate as "parties" in litigation by choice or that they may be summoned in against their

will.  *See, e.g.*, Fed. R. Civ. P. 20 (permissive joinder rule describing when persons may join as plaintiffs and when persons may be joined as defendants).  It is unclear why the parties to the Distribution Agreement would have contemplated a different rule for arbitration proceedings.  Thus, the ordinary meaning of "parties" to a legal proceeding suggests that when they stipulated that certain persons "may be the parties," the parties to the Agreements meant that such persons could be either type of party and, therefore, that any such person could require any other such person to arbitrate.

Finally, I do not agree with Plaintiffs' suggestion that the language in Section 11.7 is ambiguous.  *See* ECF No. 24 at 17.  Under Maryland law, "[a]mbiguity arises when a term of a contract, as viewed in the context of the entire contract and from the perspective a reasonable person in the position of the parties, is susceptible of more than one meaning," *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 507 (2021), and "[t]he determination of whether language is susceptible of more than one meaning includes a consideration of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution," *Calomiris v. Woods*, 353 Md. 425, 436 (1999) (internal quotation marks omitted).  "A reasonable person in the position of the parties" would not, at the time the contract was drafted, have read Section 11.7 to provide for only *voluntary* joinder by party-related persons.  In a litigation, one of the scenarios addressed by Section 11.7, such a reading would violate ordinary joinder rules, as shown above; and in an arbitration, such a reading would preclude a complete resolution of the dispute in any situation in which party-related persons needed to be part of the proceeding for the arbitrator to consider all facets of the dispute, provide all relief warranted by the facts and the law, or otherwise do justice in the dispute.  Indeed, the practical effect of such a reading would, despite the binding arbitration clause in Section 11.3, be to force the parties to the Distribution

Agreements into litigation whenever a party-related person whose participation was necessary refused to join.  Because I find that "a reasonable person in the position of the parties" would have viewed Section 11.7 to permit party-related persons to join as parties in an arbitration proceeding, voluntarily or by court order, I conclude that the Plaintiffs, who themselves signed the Distribution Agreements containing Section 11.7 as both officers of their corporate entities and as shareholder-guarantors, have agreed that they may be compelled to arbitrate.  And because it is an "affiliate" of SBD, SBC may join as a party to the arbitration and may compel other party-related persons to join.

Courts applying Maryland law have reached similar conclusions.  *See, e.g.*, *Alamria v. Telcor Intern., Inc.*, 920 F. Supp. 658, 668 (D. Md. 1996) (holding that a nonsignatory of an arbitration agreement may nevertheless be bound to arbitrate because the agreement stated that "any other business entities, affiliates, individuals, subsidiaries, or the like, of the Client that exist or shall be created in the future is part of this agreement").  And a similar case from this District is *Andreoli v. Comcast Cable Commc'ns Mgmt., LLC*, No. 3:19-CV-00954, 2020 WL 1242919 (D. Conn. 2020).  There, the court, applying Illinois law, concluded that the chief executive officer of a company consented to arbitrate her claims because she signed in her corporate capacity an agreement stating that "the parties" to be bound by the arbitration clause included "the parties' respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors and assigns."  *Id.* at 82.  Thus, the *Andreoli* court concluded that the executive "surely knew that she was agreeing to bind herself as an agent or employee of" her company.  *Id.*

Plaintiffs rely on *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60 (D. Conn. 2020), in arguing that they are not bound by any arbitration agreement.  In that case, two owners of LLCs

who acted as delivery drivers signed delivery service agreements with a logistics company on behalf of their LLCs.  *Id.* at 64–66.  After the drivers filed a complaint against the logistics company for alleged wage law violations, the company filed a motion to compel arbitration per the agreements' arbitration provisions.  *Id.* at 65.  Unlike in this case and *Andreoli*, there was no language in the agreement purporting to bind any owner, employee, or other affiliate of the LLCs to arbitration, and so the court noted that "[i]t is hornbook law that the fact that a corporate owner or agent may sign a contract on a company's behalf does not mean—without more—that the owner or agent is ***personally*** a party to the contract."  *Id.* at 68 (emphasis in original).  Thus, the court held that the agreements were not binding on the drivers because they signed the agreements only in their representative capacities as owners of the LLCs.  *Id.* at 68–73.

*Green* does not help Plaintiffs because, as the *Green* court explained, signing in a representative capacity a contract that includes an arbitration agreement does not "*without more*" require a corporate owner to arbitrate.  *Id.* at 68 (emphasis added).  But here there is "more"— namely, the fact that the arbitration provisions binds not only Plaintiffs' companies, but also their "affiliates and their respective owners, officers, and directors."  By their plain language, the Distribution Agreements permit Plaintiffs' companies' "affiliates and their respective owners, officers, and directors" to be made parties to a legal proceeding, including arbitration.

## C.    Enforceability

Because I have concluded that the Distribution Agreements require Plaintiffs to arbitrate, I must grant Defendants' motion to compel arbitration unless I find that the arbitration provisions of the Distribution Agreements are unenforceable.  Plaintiffs contend that they are, describing the arbitration provisions as being "[p]ermeated with [u]nconscionable [t]erms."  *See* ECF No.

24 at 35–36.  But I may not decide the issue of enforceability if the Distribution Agreements

validly delegate that issue to the arbitrator.  It is to the question of delegation that I turn next.

### 1.    Delegation via Incorporation of JAMS Rules

The Distribution Agreements explicitly invoke Judicial Arbitration and Mediation

Services, Inc. ("JAMS"),  stating that "[a]ny dispute between the parties subject to this Article

shall be decided by neutral, binding arbitration conducted in accordance with the [JAMS]."  *See*

ECF No. 11 at 69, 103, 138.  JAMS rules provide that the arbitrator will rule on questions of

enforceability and other "gateway" issues related to arbitrability:  "Jurisdictional and arbitrability

disputes, including disputes over the formation, existence, *validity*, interpretation or scope of the

agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall

be submitted to and ruled on by the Arbitrator."   JAMS, Employment Arbitration Rules and

Procedures 11(b) (emphasis added); *see also* Rule 1(a)(noting that the Employment Arbitration

Rules and Procedures apply whenever "the disputes or claims are employment-related."); ECF

No. 1 ¶¶ 30–37(complaint alleging that Plaintiffs "are employees entitled to the protections of

Connecticut's wage statutes," that "Defendant is [Plaintiffs'] employer," that "Defendant" made

unlawful deductions from Plaintiffs' wages, and that "Defendant . . . failed to pay Plaintiffs

overtime premiums for all hours worked in excess of forty hours per week," in violation of

Connecticut wage statutes).  "[D]isputes over validity," which Rule 11(b) delegates to the

arbitrator, include disputes over unconscionability.  *Rent-A-Center, West, Inc. v. Jackson*, 561

U.S. 63, 71 (2010) (describing "unconscionability" as a "basis of invalidity for the contract.").

To be sure, "gateway questions of arbitrability," *id*. at 69 (internal quotation marks

omitted), including issues of validity,[3] are ordinarily for the Court to decide, but these issues are

---

[3] Courts often use "arbitrability" as a catch-all phrase for challenges to the scope and enforceability (*i.e.*, validity) of
an arbitration clause, and have specifically treated unconscionability as falling under the broad umbrella of

for the arbitrator where the parties "clearly and unmistakably" agree to arbitrate them.  *See id.* at 69 n.1; *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract.").  And incorporating the JAMS rules into an arbitration agreement by reference constitutes "clear[] and unmistakabl[e]" evidence that the parties agreed to delegate questions of arbitrability to an arbitrator.  The Second Circuit—along with "virtually every circuit to have considered the issue," *Patrick v. Running Warehouse*, LLC, 93 F.4th 468, 480–81 (9th Cir. 2024) (internal quotation marks and alterations omitted)—has held that "when . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005).  As the language quoted above from JAMS Rule 11(b) makes clear, the JAMS rules "empower an arbitrator to decide the gateway issues of arbitrability."  *Deleon v. Dollar Tree Stores, Inc.*, No. 3:16-CV-00767, 2017 WL 396535, at *5 (D. Conn. Jan. 30, 2017).  So incorporation of the JAMS rules in the Distribution Agreements clearly and unmistakably shows an intent to arbitrate gateway questions of arbitrability, *see Emilio v. Sprint Spectrum L.P.*, 508 Fed. Appx. 3, 5 (2d Cir. 2013) (finding incorporation of JAMS rules was clear and unmistakable delegation of arbitrability issues), including Plaintiffs' unconscionability challenge.

---

"arbitrability." *Rent-A-Center, West, Inc.*, 561 U.S. at 68-69 (describing the plaintiff's unconscionability challenge as a "gateway question[] of arbitrability" (internal quotation marks omitted)); *Pahwa*, 2016 WL 7635748, at *18 ("The Supreme Court has . . . recognized that, through a delegation provision, parties can agree to arbitrate gateway questions of arbitrability, including whether the arbitration agreement is unconscionable." (internal quotation marks omitted)); *Yost v. Everyrealm, Inc.*, No. 22-CV-6549, 2023 WL 2859160, at *7 (S.D.N.Y. Apr. 10, 2023) ("[A]s numerous courts have held, the AAA's Rules empower the arbitrator to resolve questions of arbitrability, including based on claims of as-applied unconscionability); *see also Emilio v. Sprint Spectrum L.P.,* 508 Fed. Appx. 3, 4 (2d Cir. 2013) ("[T]he enforceability of a class action waiver in an arbitration clause is a question of arbitrability . . . .").

Plaintiffs resist this conclusion, arguing that the Distribution Agreements' reference to JAMS is insufficient to show delegation because "there has been no incorporation of any particular set of rules here." ECF No. 24 at 24. To be sure, JAMS has several sets of rules and the Distribution Agreements fail to identify which of these sets of rules would apply; indeed, the Agreements do not refer to "rules" at all, stating merely that "[a]ny dispute . . . shall be decided by neutral, binding arbitration conducted in accordance with [JAMS]." ECF No. 11at 103. But as another court observed when reviewing an identically worded arbitration provision in a case also involving SBC and SBD, the use of the phrase "in accordance with" suggests that the parties to the Distribution Agreements meant to adopt JAMS's rules and procedures:

> Plaintiffs' proposed reading of Section 11.3 to mean that the arbitration would be conducted by JAMS, but not actually subject to JAMS Rules, is also unreasonable. The relevant language in Section 11.3 provides that the parties' dispute "shall be decided by a neutral, binding arbitration conducted in *accordance* with [JAMS]." ECF No. 28-2 at 27, 59. (emphasis supplied). The ordinary meaning of the word "accordance" is to follow a rule. *See Accordance* MERRIAM-WEBSTER DICTIONARY ("in a way that agrees with or follows (something, such as a rule or request)"); *see also Accordance* CAMBRIDGE DICTIONARY https://dictionary. cambridge.org/us/dictionary/english/accordance (last visited Feb. 14, 2023). And so, Section 11.3 makes clear that the JAMS[']s rules and procedures apply to the parties' disputes under the Distribution Agreement.

*Gray v. Schmidt Baking Co., Inc.*, No. 22-CV-00463-LKG, 2023 WL 2185778 *8 (D. Md. Feb. 23, 2023). Further, the JAMS rules themselves indicate that invoking JAMS as the arbitrator is enough to incorporate the applicable rules: "The Parties shall be deemed to have made these Rules a part of their Arbitration Agreement whenever they have provided for . . . [a]rbitration by JAMS without specifying any particular JAMS Rules and the disputes or claims [are 'employment-related']." JAMS Employment Arbitration Rules and Procedures, Rule 1(b); *see also* Rule 1(a). As suggested earlier, the claims Plaintiffs assert are plainly "employment-related" because they allege that Plaintiffs were Defendants' employees and that Defendants

underpaid them in violation of Connecticut wage laws.[4]  Finally, Plaintiffs do not point to any authority indicating that parties must refer to specific sets of rules to clearly and unmistakably delegate issues of arbitrability, nor can I find any.

Plaintiffs also argue that they are unsophisticated parties and so should not be bound by delegation via incorporation of the JAMS rules.  ECF No. 24 at 25–26.  But at least some courts in this Circuit have rejected this argument.  *See Peni v. Daily Harvest, Inc.*, No. 22-CV-5443, 2022 WL 16849451, at *7 (S.D.N.Y. Nov. 10, 2022) (noting that "[a]lthough the Second Circuit has not addressed whether the import of rule incorporation differs based on the parties' sophistication, other circuits appear to apply the same rule even to unsophisticated parties" and holding that "the parties . . . delegated questions of arbitrability to the arbitrator through incorporation of the JAMS Rules" notwithstanding the plaintiff's argument that she was an "unsophisticated customer"); *see also Doctor's Assocs., Inc. v. Inder Pahwa & Satinder Pahwa*, No. 16-CV-00446, 2016 WL 7635748, at *19 n.14 (D. Conn. Nov. 3, 2016) (rejecting defendants' argument that delegation via rule incorporation "has been limited . . . to arbitration agreements between sophisticated commercial parties"), *report and recommendation adopted sub nom. Doctor's Assocs. Inc. v. Pahwa*, No. 16-CV-446, 2016 WL 7410782 (D. Conn. Dec. 2, 2016); *Doctor's Assocs., Inc. v. Tripathi*, No. 3:16CV00562, 2016 WL 7634464, at *17 n.13 (D. Conn. Nov. 3, 2016) (same), *report and recommendation adopted*, No. 3:16-CV-562, 2016 WL 7406725 (D. Conn. Dec. 2, 2016), *aff'd sub nom. Doctor's Assocs., LLC v. Tripathi*, 794 F.

---

[4] In any event, other sets of JAMS rules that might conceivably apply here include the same broad delegation language that the employment rules do.  *See* Rule 8 of the JAMS Streamlined Arbitration Rules & Rule 11 of the JAMS Comprehensive Arbitration Rules (both providing that that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.").

App'x 91 (2d Cir. 2019).[5]  And while the Second Circuit has not yet addressed this issue, every

Circuit to consider it has declined to distinguish between sophisticated and unsophisticated

parties.  *See Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 851 (6th Cir. 2020)

(noting that "nothing in the Federal Arbitration Act purports to distinguish between

'sophisticated' and 'unsophisticated' parties"); *Richardson v. Coverall N. Am., Inc.*, 811 F.

App'x 100, 104 (3d Cir. 2020) (rejecting the plaintiff's argument that delegation via rule

integration was "unreasonable in agreements involving 'unsophisticated parties'" and noting that

such a rule would "ignore even the plainest of delegations"); *Arnold v. Homeaway, Inc.*, 890

F.3d 546, 552 (5th Cir. 2018) (rejecting the plaintiff's "policy-based" exception to delegation via

rule integration for unsophisticated parties).  The question whether incorporation provides

"clear[] and unmistakabl[e]" evidence of intent to delegate should not turn on the sophistication

of the parties.[6]

---

[5] Plaintiffs cite two contrary cases.  In the first, the Eastern District of New York declined to find that an arbitration agreement clearly and unmistakably delegated issues of arbitrability where the agreement incorporated AAA rules. *Vidal v. Advanced Care Staffing, LLC*, No. 1:22-CV-05535, 2023 WL 2783251, at *9 (E.D.N.Y. Apr. 4, 2023).  But that court held that the delegation was not clear and unmistakable largely because it found "language [in the agreement] explicitly providing for judicial intervention on issues of enforceability."  *Id.* at *11.  No such language exists here.  In the second case, the District of Maryland held that delegation via integration of the AAA rules would not apply to an agreement "between a Fortune 500 company and a consumer."  *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 3d 539, 555 (D. Md. 2019).  But in reaching this conclusion, the court relied at least in part on caselaw that has since been overturned.  *See id.* (citing *Richardson v. Coverall N. Am., Inc.*, No. CV18532MASTJB, 2018 WL 4639225, at *3 (D.N.J. Sept. 27, 2018), *rev'd in part, vacated in part*, 811 F. App'x 100 (3d Cir. 2020) (rejecting notion that it was unreasonable to rely on incorporated rules in cases involving unsophisticated parties because that position "would disregard the 'clear and unmistakable' standard and ignore even the plainest of delegations.").

[6] In any event, Plaintiffs here have not done enough to show that they are, in fact, unsophisticated parties.  Plaintiffs assert that they are unsophisticated because they are "truck drivers" and because Silva only has a high school education and Rothkugel "has never studied business."  ECF No. 24 at 11, 24–25.  But the record indicates that they were sophisticated enough to create and profitably run their corporate entities.  Silva, as President of Silva's Baked Goods, sold the distribution rights to many of his company's customers for approximately double the financed price, *see* ECF No. 28-1 at ¶¶ 33, 39–44, and his company made hundreds of thousands of dollars in pre-tax net revenue over the course of his company's ownership of the distribution rights, *see id.* at ¶¶ 37, 46.  Similarly, Rothkugel, as President of Trout Slayers, sold the distribution rights to his sales area for nearly double its financed price, *see id.* at ¶¶ 18–22, and his company made nearly a hundred thousand dollars in pre-tax net revenue over the course of his company's one-year ownership of the distribution rights, *see id.* at ¶ 28.  Thus, Plaintiffs were sophisticated enough to profitably operate their businesses and to engage in transactions to sell their distribution rights at considerable profits.  In light of these facts, Plaintiffs' purportedly limited formal education and their status as "truck drivers" is not sufficient to demonstrate that they are "unsophisticated."  *See, e.g.*, *Peterson v. Tiffin Motor Homes, Inc.*, No.

### 2.    Unconscionability of Delegation Clause

Plaintiffs also challenge the enforceability of the delegation clause itself, arguing that it "unconscionable and unenforceable."  ECF No. 24 at 26.  In spite of the broad language of the JAMS rules, which require submission to the arbitrator of all disputes over "formation, existence, integration or scope of the agreement," the question of the enforceability of the delegation clause is for me to decide.  *See Rent-A-Ctr.*, 561 U.S. 71 ("If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with the agreement" and explaining that the "precise agreement to arbitrate at issue" in that case was "the delegation provision—the provision that gave the arbitrator exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement," rather than the "remainder of the contract," which was an arbitration agreement (internal quotation marks omitted)).

Under Maryland law,[7] a party seeking to challenge the enforceability of an arbitration agreement must prove both substantive and procedural unconscionability.  *Felix v. Richard D. London & Assocs., P.C.*, No. 19-CV-2795, 2020 WL 4933632, at *5 (D. Md. Aug. 24, 2020) ("Maryland courts require both procedural and substantive unconscionability before they will refuse to enforce an arbitration agreement."); *Freedman v. Comcast Corp.*, 190 Md. App. 179, 207–08 (Md. Ct. Spec. App. 2010) ("The prevailing view is that both procedural and substantive unconscionability must be present in order for a court to invalidate a contractual term as unconscionable.").  "Substantive unconscionability involves those one-sided terms of a contract

17-CV-01186, 2019 WL 6320341, at *11 (W.D.N.Y. Nov. 26, 2019), *report and recommendation adopted*, No. 17-CV-1186, 2020 WL 10223304 (W.D.N.Y. Mar. 5, 2020).

[7] Because unconscionability is a state-law doctrine that challenges the enforceability of a contract or terms therein, the Distribution Agreements' choice-of-law provision controls, and so I must apply Maryland law to this issue.  *See Hottle v. BDO Seidman LLP*, 268 Conn. 694, 706 & n.7, 707, 719–22 (2004) (applying New York law to an arbitrability dispute under a contractual choice-of-law provision).

from which a party seeks relief (for instance, 'I have the right to cut off one of your child's fingers for each day you are in default'), while procedural unconscionability deals with the process of making a contract—'bargaining naughtiness' (for instance, 'Just sign here; the small print on the back is only our standard form')." *Walther v. Sovereign Bank*, 386 Md. 412, 427 (2005) (internal quotation marks omitted).

### i.        Substantive Unconscionability

Substantively unconscionable terms are "unreasonably favorable to the more powerful party," "impair the integrity of the bargaining process or otherwise contravene the public interest or public policy," "attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law," or are otherwise "unreasonably and unexpectedly harsh." *Id.* at 426.

Plaintiffs argue that the arbitration provisions' cost- and fee-shifting provisions are unconscionable as applied to the delegation clause. *See* ECF No. 24 at 28–32.  Specifically, they argue that the arbitration agreements' provision that "the prevailing party in any arbitration or other action to enforce this Agreement will be entitled to recover its reasonable attorney's fees, expert fees, costs and expenses in connection with such action" is substantively unconscionable. ECF No. 11 at 71, 105 140.

Under Maryland law, cost- and fee-shifting provisions are assessed on a "case-by-case" basis, with a "focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs." *Walther*, 386 Md. at 440.  The party resisting enforcement of the arbitration agreement has the burden of demonstrating that arbitration costs constitute a "prohibitive expense." *Id.*; *see also Doyle v. Fin. Am., LLC*, 173 Md. App. 370, 391 (Md. Ct.

Spec. App. 2007) (affirming judgment of lower court to compel arbitration where "no evidence was presented by appellants to demonstrate the excessive costs of the arbitration forum").

Here, Plaintiffs have not demonstrated that arbitration costs would be prohibitive. Plaintiffs assert that if they "challenge the cost-shifting issue in front of an arbitrator and lose, they must pay thousands of dollars to have obtained a decision on the issue." ECF No. 24 at 30. They do not, however, explain how they reached this estimate; rather, they simply point to arbitration costs incurred in other cases. But Plaintiffs "cannot meet [their] burden of showing that [they] likely will incur prohibitive arbitrator fees simply by showing the fees that some arbitrators are charging somewhere." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 182 (4th Cir. 2013). Moreover, Plaintiffs have not "provided evidence or argument about the value of [their] claim[s], which is a critical factor in a 'prohibitive costs' analysis." *Id.* Plaintiffs therefore have not carried their burden of demonstrating that they would likely face prohibitive costs if they were required to arbitrate their disputes.

In any event, Plaintiffs' concerns regarding the cost- and fee-shifting provisions seem to be moot given a notice sent to the parties from JAMS indicating that its Policy on Employment Arbitration Minimum Standards will apply "notwithstanding any contrary provisions in the parties' pre-dispute arbitration agreement." ECF No. 28-2 at 11, 19. The JAMS Policy on Employment Arbitration Minimum Standards makes clear that

> [a]n employee's access to arbitration must not be precluded by the employee's inability to pay any costs or by the location of the arbitration. The only fee that an employee may be required to pay is the initial JAMS Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fees and all professional fees for the arbitrator's services.

*Id.* at 28-2 at 15, 23. Thus, it appears the arbitration agreements' cost- and fee-shifting provisions are moot.

For these reasons, the arbitration agreements' cost- and fee-shifting provisions are not substantively unconscionable and will not bar application of the delegation clause.

### ii.        Procedural Unconscionability

Procedural unconscionability "concerns the process of making a contract and includes such devices as the use of fine print and convoluted or unclear language, as well as deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms." *Stewart v. Stewart*, 214 Md. App. 458, 477 (Md. Ct. Spec. App. 2013) (internal quotation marks omitted).

Plaintiffs argue that the delegation clauses are procedurally unconscionable because they are "contained within contracts of adhesion between parties of unequal bargaining power."[8] ECF No. 24 at 33.  "However, the fact that a contract is one of adhesion does not mean that it is automatically deemed per se unconscionable."  *Dieng v. Coll. Park Hyundai*, No. 2009-CV-0068, 2009 WL 2096076, at *6 (D. Md. July 9, 2009).  Rather, "[a] court will . . . look at the contract and its terms with some special care . . . but it will not simply excise or ignore terms merely because . . . they may operate to the perceived detriment of the weaker party."  *Meyer v. State Farm Fire Cas. Co.*, 85 Md. App. 83, 89–90 (Md. Ct. Spec. App. 1990).  As discussed previously, I have carefully considered the substantive terms of the agreement challenged by the Plaintiffs and find that they are not unconscionable.

---

[8] Though this argument applies to the contract as a whole, "[a] party may contest the enforceability of the delegation clause with the same arguments it employs to contest the enforceability of the overall arbitration agreement." *Hengle v. Treppa*, 19 F.4th 324, 335 (4th Cir. 2021); *see also Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 291 (4th Cir. 2020) ("[C]ourts have construed a party's argument that the delegation clause suffers from the same defect as the arbitration provision to be a sufficient challenge to the delegation provision itself." (internal quotation marks omitted)); *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 55 (E.D.N.Y. 2017) ("[T]o the extent that Plaintiffs argue that the delegation clause itself is unconscionable for the same reasons that the Services Agreements or arbitration provisions as a whole are unconscionable, the Court considers those arguments as applied to the delegation clause." (internal citations omitted)).

Plaintiffs further argue that the delegation clauses are procedurally unconscionable because the "clauses . . . do not contain any opt-out provisions." ECF No. 24 at 34. But Plaintiffs do not point to any authority indicating that the lack of an opt-out clause will render an otherwise lawful arbitration agreement unconscionable. While courts have found that an arbitration agreement "with a clearly-stated opportunity to opt-out without retaliation[] is not procedurally unconscionable," *Varon v. Uber Techs., Inc.*, No. 15-CV-3650, 2016 WL 1752835, at *5 (D. Md. May 3, 2016), Plaintiffs cite no cases suggesting that the converse is true.

Plaintiffs also suggest that the arbitration provisions were not sufficiently conspicuous within the Distribution Agreements. *See* ECF No. 24 at 33 ("Unbeknownst to Plaintiffs, the agreements contained an arbitration clause."). But that argument is unconvincing, as § 11.3 of the Distribution Agreements is explicitly and conspicuously titled "**ARBITRATION**" in bolded, underlined, and all capitalized letters. ECF No. 11. at 69, 103, 138 (emphasis in original); *see also Gray*, 2023 WL 2185778, at *10 (considering a substantially identical agreement to those at issue here and noting that "a careful review of the Distribution Agreement makes clear that the dispute resolution and arbitration provision are clearly identified in Article 11").

Finally, I note that SBD sent Plaintiffs disclosure documents 14 days in advance of their signing of the Distribution Agreements. On the first page of these disclosures, SBD advised Plaintiffs to "[r]ead all of your contract carefully" and to "[s]how your contract and this Disclosure document to an advisor, like a lawyer or accountant." ECF No. 28-1 at 21. These disclosures, the opportunity to review the contracts beforehand, and the advice to consult an attorney or accountant further support the conclusion that the delegation clauses contained in the Distribution Agreements are not procedurally unconscionable. *See, e.g.*, *Gray*, 2023 WL 2185778, at *10 (holding that "Plaintiffs have not shown that the arbitration agreement is

procedurally unconscionable" in part because "they were afforded at least 14 days to review the Distribution Agreement[] and were advised in writing to seek the advice of an attorney or accountant").

For these all these reasons, the delegation clauses are neither procedurally nor substantively unconscionable.

### D. Stay of Action

In sum, Plaintiffs are not exempt under § 1 of the FAA; the arbitration agreements are binding on them as owners and officers of their respective businesses; and the arbitration agreements validly delegate their unconscionability challenges to the to arbitrator.  Thus, all of Plaintiffs' remaining arguments are to be decided by an arbitrator.  Under *Katz v. Cellco Partnership*, I must stay this action pending the outcome of arbitration.  794 F.3d 341, 345 (2d Cir. 2015) ("We join those Circuits that consider a stay of proceedings necessary after all claims have been referred to arbitration and a stay requested.").

## V. CONCLUSION

For the reasons explained herein, the Motion to Compel Arbitration, ECF No. 10, is GRANTED, and the action is stayed.  The Clerk is instructed to administratively close this case. Either party may move to reopen this case following the decision by the arbitration panel.  Any such motion must be filed within 30 days of the rendering of the decision and a copy of the decision must be filed with the Court.


IT IS SO ORDERED.

                                        /s/
                              _____

                                    Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut

May 2, 2024